**FORT WORTH CLUB OF FORT WORTH, TEXAS, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 4507.**

United States District Court
N. D. Texas,
Fort Worth Division.

June 4, 1963.

Harry C. Weeks (of Weeks, Bird, Cannon & Appleman), Fort Worth, Tex., for plaintiff.

Louis F. Oberdorfer, Asst. Atty. Gen., Edward S. Smith, Myron C. Baum, Stanley F. Krysa, Attys., Dept. of Justice, Fort Worth, Tex., for defendant.

SHEEHY, District Judge.

This is an action to recover income taxes and interest thereon heretofore paid by Plaintiff for its fiscal year ended April 30, 1960.

On June 10, 1885, a corporation named Fort Worth Club of Fort Worth, Texas, was chartered under the laws of the State of Texas. That corporation expired 50 years after it came into existence. On June 21, 1935, Fort Worth Club of Fort Worth, Texas, the Plaintiff in this cause, which hereinafter will be referred to as Fort Worth Club, was chartered under the laws of the State of Texas on June 21, 1935, for the purpose of renewing and extending the existence of Fort Worth Club as a "downtown men's club" for another 50 years.

By rulings dated November 1, 1934, and November 22, 1937, the Internal

Revenue Service ruled that Plaintiff was exempt from Federal income taxes under, as to the first ruling, Section 103(9) of the Revenue Act of 1932, and as to the second ruling, under the same section of the Revenue Act of 1934. By ruling dated August 21, 1959, the Internal Revenue Service ruled that Plaintiff was not entitled to exemption from Federal income taxes as a social club under Section 501(c) (7) of the Internal Revenue Code of 1954, and that the aforesaid earlier rulings were revoked. By its terms the last mentioned ruling was to be applied prospectively, and Plaintiff was required thereby to file an income tax return as a taxable corporation for its fiscal year ended April 30, 1960, and subsequent years. In obedience to this ruling, but without agreeing to the correctness of same, Plaintiff filed an income tax return as a taxable corporation for its fiscal year ended April 30, 1960. The tax liability in the amount of $1,062.58 as shown by said return, with interest thereon in the amount of $26.73, was paid by Plaintiff to the District Director of Internal Revenue, Dallas, Texas, on December 14, 1960. On or about December 28, 1960, Plaintiff duly filed with said District Director a claim for refund of the tax and interest so paid. This claim was based upon the theory and claim that Plaintiff was a social club exempt from Federal income taxation under Section 501(c) (7) of the Internal Revenue Code of 1954. No part of said refund claim has been allowed, and the amount of the tax and interest has not been refunded or otherwise credited to or allowed Plaintiff. All prerequisites to the institution of this suit and Plaintiff's right to prosecute same have been complied with.

From the time of its original organization in 1885 to the present, it has been the bona fide belief of the majority of the members of Fort Worth Club and its corporate officers that it would not be desirable or advantageous for it to occupy the ground floor of the building where it was quartered, and that to achieve the permanency desirable and necessary for continued existence and successful operation, Fort Worth Club should own, directly or indirectly, the premises which contained its club quarters. In keeping with that belief Fort Worth Club acquired in 1887 a three-story building at Sixth and Main Streets, Fort Worth, Texas. It rented the ground floor to a commercial tenant and used the upper two floors as club quarters for its members. These quarters consisted of dining rooms, lounges, card and billiard rooms and similar facilities. In 1915 a six-story building was erected by Fort Worth Club on this site, with the upper floors thereof being used as club quarters and the ground floor being rented to a business organization. This ownership, and such use and occupancy, continued until 1924, when that property was sold, and the present site of the Fort Worth Club Building (Lots 1 and 4, Block 106, Fort Worth, Texas), which is located in the downtown business district of Fort Worth, was acquired by Fort Worth Club for the purpose of erecting thereon a building which would furnish more commodious club quarters and rentable space commensurate with the expanding membership and needs of the Club. This plan was carried out, and a building continuously known, and hereinafter referred to as "Fort Worth Club Building" was erected.

The Fort Worth Club Building covers the entire area of Lots 1 and 4, Block 106. The building as originally constructed contained twelve floors and a full basement. Subsequently, the roof was so altered that it, in effect, is a thirteenth floor. To finance the construction of this building, it was necessary for Fort Worth Club to borrow a substantial sum of money. Eight Hundred Thousand ($800,000.00) Dollars of the required sum was borrowed from an unrelated lending company which refused to make a loan to a social club. To meet this objection, Fort Worth Club, in 1924, caused to be organized, as a wholly-owned subsidiary, a Texas business corporation known as Fort Worth Club Building Corporation, to which corporation Fort Worth Club conveyed title to the prem-

ises upon which the building was to be erected, and this subsidiary, upon the security of the premises and building to be erected thereon, obtained the loan of $800,000.00. The balance of the funds, namely, $600,000.00 needed to construct the building and furnish the club quarters therein was borrowed from Fort Worth Club members. Fort Worth Club continued as the owner of the Fort Worth Club Building Corporation stock until the Building Corporation was dissolved.

In 1955 the loans obtained to construct the new building and furnish the club quarters had been fully repaid, and the property was clear of liens, thereby Fort Worth Club, as the sole stockholder of the Fort Worth Building Corporation, dissolved that corporation and took title to the premises theretofore transferred to it. Fort Worth Club then caused to be organized a Texas corporation known as Club Building Title Holding Company "for the exclusive purpose of owning a building on Lots 1 and 4, Block 106, City of Fort Worth, Tarrant County, Texas, collecting the income therefrom and turning over the entire amount thereof, less expenses, to Fort Worth Club, a Texas corporation," hereinafter referred to as Title Holding. Fort Worth Club subscribed to and paid for, and has continued to own, all of the capital stock of Title Holding. Upon the organization of Title Holding, Fort Worth Club conveyed to it the Fort Worth Club Building and premises, reserving, however, title to and use of the space in said building occupied by Fort Worth Club for club purposes, with appropriate rights of ingress, egress, etc. This situation has continued to the present time.

At the time the Fort Worth Club Building was constructed it was planned that Fort Worth Club would use for club purposes all of the tenth, eleventh and twelfth floors and approximately the south one-half of the seventh, eighth and ninth floors as well as a substantial part of the basement; that the entire first to fifth floors, inclusive (less necessary elevator and lobby spaces) and a part of the basement would be leased to a furniture store and the north one-half of the seventh, eighth and ninth floors would be leased to the Fort Worth and Denver City Railway Company for its general offices; and that in order to reserve space for future expansion by Fort Worth Club or said tenants the sixth floor space would be rented for miscellaneous office use. These plans were carried out. The sixth floor space has continued so to be used except that a part of the sixth floor is now used by Fort Worth Club as its business and accounting offices. After several years the furniture store vacated the premises occupied by it and after said premises had remained vacant for some time, the entire area was leased to R. E. Cox and Company, a department store. This occupancy continued until 1956 when said store vacated its space. Efforts to obtain one tenant for all the space having failed, Fort Worth Club and Title Holding, in about 1958, began a program of renovating and refurnishing the spaces used by Fort Worth Club for its purposes and remodeling and rearranging the first five floors of the building so that tenants for such spaces could be obtained. This program, which was initiated and decided upon by the Board of Governors of Fort Worth Club, was completed about April 1, 1960. The entire ground floor of the building was leased in separate parcels to three tenants, and substantially all of the next four floors were leased for offices. To finance this remodeling, renovating and refurnishing, Fort Worth Club and Title Holding borrowed from an insurance company $1,600,000.00 secured by a lien on the entire property and also borrowed $250,000.00 from Fort Worth Club members. Pending the completion of this program, which completion was necessary in order to obtain the entire proceeds from the insurance company loan, the program was financed in part from Fort Worth Club's accumulations and part from interim loans from local banks. The program of renovating and refurnishing the portion of the building occupied by Fort Worth Club, including increasing the size of the kitchen, was

done so as to attract more use of the Club by its members and was done at a cost of approximately $750,000.00.

The management of Fort Worth Club is under the jurisdiction and control of the Board of Governors of Fort Worth Club. One Bryant N. Thompson has been General Manager of Fort Worth Club since March 1, 1951, and has been Building Manager of Title Holding since its incorporation. The Board of Governors has control and supervision of Thompson in the performance of his duties as General Manager of Fort Worth Club and, through Directors of Title Holding selected by them, as Building Manager of Title Holding. In his capacity as Building Manager of Title Holding, Thompson has from time to time arranged leases for space on the sixth floor of the Fort Worth Club Building as space on that floor became vacant or tenants wanted more or less space thereon. All leasing and rental arrangements for space on the first five floors of the building were made by real estate agents employed on a commission basis by Title Holding with the approval of the Board of Governors of Fort Worth Club. At all times since its organization until the present time all officers and directors of Title Holding were members of Fort Worth Club.

The Fort Worth Club Building has three sets of elevators, all of which are operated by employees of Title Holding. Those on the north end of the building are for the exclusive use of tenants of the Fort Worth Club Building. Those near the center of the building are for the use of the tenants of the first five floors and those on the south end of the building are for the use of Fort Worth Club members, guests, employees and tenants of the sixth floor. The engineering and maintenance personnel for the building are employees of Title Holding. At times these employees make minor repairs and do maintenance work for Fort Worth Club. The salaries and wages of these employees are paid by Title Holding and are treated as a part of its operating expenses. Fort Worth Club does not pay Title Holding for any such services rendered by such employees.

Since its existence Title Holding was required to and did pay over to Fort Worth Club each month all of its income less expenses. The amount of money transferred from Title Holding to Fort Worth Club for the fiscal years ended April 30, 1956, through April 30, 1961, inclusive, is as follows:

| Fiscal Year | Amount Paid Fort Worth Club |
|---|---|
| April 30, 1956 | $ 46,229.07 |
| April 30, 1957 | $ 95,000.00 |
| April 30, 1958 | $ 50,000.00 |
| April 30, 1959 | $ 81,489.61 |
| April 30, 1960 | $150,000.00 |
| April 30, 1961 | $ 55,000.00 |

These monies received by Fort Worth Club from Title Holding were deposited in the Fort Worth Club's general bank account and were used for various Club purposes, which included payment of general expenses of the Club (employees salaries, purchase of game equipment, payment of utilities, etc.) as well as for reducing the debt of Fort Worth Club and Title Holding incurred to remodel the property and to renovate and redecorate the Club's facilities and to make structural modifications in the space occupied by the Club.

In 1959 in order to try to get new members and increase the use of the Club and its facilities, membership fees generally were reduced and the dues of members were increased. During the past twenty years the charges made to members of the Club for services such as meals, beverages, barbershop services, etc., have gradually been increased.

Fort Worth Club at no time during its existence has made any distribution of assets or earnings to its members. Its earlier practice of redeeming memberships by refunding membership fees paid upon the death or resignation of a member was discontinued some thirty years ago. The members of the Board of Governors of the Club and other members serving on its committees, as well as

members serving as officers and directors of Title Holding receive no compensation for their services.

The charter of Fort Worth Club provides that such corporation shall not have any capital stock. Therefore, Fort Worth Club has no stockholders. Section 12 of the By-Laws of Fort Worth Club provides as follows:

"No member of the Club shall obtain or have any proprietary interest in any property belonging to the Club by virtue of his membership."

The issue in this case is whether, because of Plaintiff's ownership of all of the capital stock of Title Holding, its participation and management of said company, its receipt and use of the revenues of said company, all as above pointed out, Plaintiff was operated exclusively as a social club during the fiscal year here in question within the purview of Section 501(c) (7) of the Internal Revenue Code of 1954.

Section 501 of the Internal Revenue Code of 1954 provides in part as follows:

"(a) Exemption From Taxation. —An organization described in subsection (c) or (d) of section 401(a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502, 503, or 504. * * *

"(c) List of Exempt Organizations.—The following organizations are referred to in subsection (a): * * *

"(2) Corporations organized for the exclusive purpose of holding title to property, collecting income therefrom, and turning over the entire amount thereof, less expenses, to an organization which itself is exempt under this section. * * *

"(7) Clubs organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes, no part of the net earnings of

which inures to the benefit of any private shareholder."

The ruling of the Internal Revenue Service revoking, prospectively, the classification of Fort Worth Club as a corporation exempt from income taxes under said Section 501(c) (7), which ruling brought about this controversy, was predicated entirely upon the fact that Title Holding paid its net revenues, which were in substantial sums, to Fort Worth Club. Except for the relationship and transactions between Fort Worth Club and Title Holding, hereinabove set forth, Fort Worth Club unquestionably was entitled to exemption under said Section 501(c) (7). Were the relationship and transactions between Fort Worth Club and Title Holding such as to destroy Fort Worth Club's exempt status under Section 501(c) (7)? In my opinion, they were not.

Since the enactment of the Revenue Act of 1916, Congress has exempted various types of organizations from the income tax which would otherwise apply. Section 11(a) of the Internal Revenue Code of 1916 provides in part as follows:

"[T]here shall not be taxed under this title any income received by any * * * Ninth Club organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes, no part of the net income of which inures to the benefit of any private stockholder or member * * * Twelfth. Corporations or associations organized for the exclusive purpose of holding title to property, collecting income therefrom, and turning over the entire amount thereof, less expenses, to an organization which itself is exempt from the tax imposed by this title."

These provisions were carried forward, with only one pertinent change, in the Revenue Acts of 1918, 1921, 1924, 1926, 1928, 1932, 1934, 1936, 1938, the Internal Revenue Code of 1939,[1] and finally

---

1. See Sections 231(9) and (12), Revenue Act of 1918; same Sections, Revenue Acts of 1921 and 1924; Sections 231(9) and (13), Revenue Act of 1926; Sections 103(9) and (14), Revenue Act of 1928; Sections 103(9) and (14), Revenue Act

into Sections 501(c) (2) and (c) (7) of the Internal Revenue Code of 1954, above quoted, which apply in the instant case.

The only change made in this long history occurred in the Revenue Act of 1924. The 1916, 1918 and 1921 Acts as to the inurement of net income provided:

"* * * no part of the net income of which inures to the benefit of any private stockholder or *member*." (Emphasis supplied)

But the 1924 Act and all subsequent Acts omitted the phrase "or member." The importance of this omission is emphasized by the continuing reference to "private shareholder or individual" in other subdivisions of the Internal Revenue Code classifying various organizations as exempt from taxation.[2]

In 1924 the Supreme Court in Trinidad v. Sagrada Orden de Predicadores, etc., 263 U.S. 578, 44 S.Ct. 204, 68 L.Ed. 458, dealing with a charitable organization and its exempt status, laid down the rule that it was the destination, rather than the source, of an organization's income, or the use which was made of it, which determined whether the organization was exempt from taxation as a religious or charitable organization. Following that decision, a practice developed by which a corporation, or similar organization, would be created for a purpose which would entitle it to exempt classification, and it would then acquire a business enterprise which it would operate income tax free and some part of its income would be paid over to the charitable organization for its support in the furtherance of the exempt purpose for which it was organized. These are referred to as "feeder organizations." In attempting to settle the controversies arising as to the exempt status of such organizations, Congress undertook to deal with the problem in the Internal Revenue Act of 1950 by providing in that Act that

exempt organizations would be taxed as an ordinary business corporation upon their "unrelated business net income," which income was all income other than interest, rents, dividends, royalties, etc.; by imposing restrictions upon the practice of an exempt organization purchasing real estate, largely upon credit, and leasing it to the seller or others; and by restricting certain other transactions. These provisions were carried forward in substantially unchanged form in the Internal Revenue Code of 1954.[3] Congress at that time also enacted what is now Section 502 of the Internal Revenue Code of 1954 and which deals specifically with "feeder organizations." This section provides:

"An organization operated for the primary purpose of carrying on a trade or business for profit shall not be exempt under section 501 on the ground that all of its profits are payable to one or more organizations exempt under section 501 from taxation. *For purposes of this section, the term 'trade or business' shall not include the rental by an organization of its real property (including personal property leased with the real property)*." (Emphasis supplied)

Apparently there are no court decisions dealing directly with the problem here presented, i. e., the receipt by a social club of the net revenue of its title holding company. An examination of the legislative history of what is now Section 501(c) (2) and (7) and the other statutory provisions, above referred to, as heretofore briefly summarized, leads me to conclude that:

(1) Congress, since at least 1916, has intended to exempt social clubs along with certain other organizations from income tax even though such social clubs would have income upon which they would be required to pay income taxes

---

of 1932; Sections 101(9) and (14), Revenue Acts of 1934, 1936, 1938 and Internal Revenue Code of 1939.

2. See Sections 501(c) (3), (6), (9), (10) and (13), Internal Revenue Code of 1954.

3. See Sections 503 through 514, Internal Revenue Code of 1954.

but for the exemption and without limitation on the amount of such income.

(2) Congress continuously from 1916 has specifically exempted clubs organized for the exclusive purpose of holding title to property, collecting income therefrom and turning the entire amount thereof, less expenses, over to an organization such as a social club which itself was exempt from income taxation.

(3) Congress in denying exempt classification to "feeder organizations," even though their profits were paid over to exempt organizations, and to impose the ordinary tax upon the unrelated business net income of organizations otherwise exempt, saw fit to provide that the "rental by an organization of its real property (including personal property leased with the real property)" should not be considered the operation of a trade or business, thus preserving the original integrity and scope of what is now Section 501(c) (2), Internal Revenue Code of 1954, so that the renting or leasing by a title holding company of its real estate, such as was done by Title Holding in the instant case, cannot bring it within the classification of an organization "operating for the primary purpose of carrying on a trade or business for profit" within the scope of Section 502, Internal Revenue Code of 1954.

■ (4) Congress having required that a title holding company, holding the title to property for an otherwise exempt organization, should collect the revenues therefrom, which would include rents, and, after paying expenses, pay over the balance to an exempt organization, did not intend that the amounts so paid to the exempt organization would destroy the exemption of the recipient organization, such as Fort Worth Club, otherwise exempt under Section 501(c) (7), Internal Revenue Code of 1954.

■ In light of the foregoing conclusions, Fort Worth Club is entitled to retain its exempt status, unless it used the monies received from Title Holding, or any part thereof, in such a manner that same, or any part thereof, inured to the benefit of any private shareholder within the meaning of Section 501(c) (7), Internal Revenue Code of 1954. Strictly speaking, Fort Worth Club had no shareholders, private or otherwise, and for that reason no part of Fort Worth Club's income from Title Holding could inure to the benefit of a private shareholder. But even if it could be said that the members of Fort Worth Club were shareholders of Fort Worth Club within the meaning of said Section 501(c) (7), no part of the income from Title Holding inured to the benefit of any member of Fort Worth Club because the By-Laws of the Club, as above pointed out, expressly provide that no member shall have a proprietary interest in any of the properties of the Club. Furthermore, the fact that part of the funds obtained by Fort Worth Club from Title Holding might have been used to pay off the indebtedness of the Club incurred in the remodeling and renovating of the Club, and the fact that but for such income from Title Holding the Club might have been compelled to raise the dues of its members and the charges made for the services rendered its members would not render said funds as funds inuring to the benefit of a shareholder or member of Fort Worth Club within the meaning of Section 501(c) (7), Internal Revenue Code of 1954.[4]

Under the facts in this case and the conclusions reached, all as hereinabove set out, I find and conclude that for its tax year in question Fort Worth Club was exempt from income taxation under the provisions of Section 501(c) (7), Internal Revenue Code of 1954.

Judgment will be entered for the Plaintiff in the amount of $1,089.31, with interest thereon from December 14, 1960, as provided by law.

This Memorandum Decision will constitute the Findings of Fact and Conclusions of Law herein as provided for by Rule 52, F.R.Civ.P.

4. Koon Kreek Klub v. Thomas (5 Cir.) 108 F.2d 616, 618.